# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

ONEIDA TRIBE OF INDIANS OF WISCONSIN,

        Plaintiff,

    v.                                      Case No. 10-C-137

VILLAGE OF HOBART, WISCONSIN,

        Defendant/Third-Party Plaintiff,

    v.

UNITED STATES OF AMERICA,
UNITED STATES DEPARTMENT OF JUSTICE,
UNITED STATES DEPARTMENT OF THE INTERIOR,
and KENNETH SALAZAR, SECRETARY, UNITED
STATES DEPARTMENT OF THE INTERIOR,

        Third-Party Defendants.

## ORDER GRANTING MOTION FOR SUMMARY JUDGMENT AND GRANTING MOTION TO DISMISS

This case represents another battle in the ongoing conflict between the Oneida Tribe of Indians of Wisconsin and the Village of Hobart over the regulatory control of the land situated within their common boundaries. Plaintiff Oneida Tribe of Indians of Wisconsin (the Tribe) filed this action on February 19, 2010, seeking a declaratory judgment that the Village of Hobart (the Village) lacks authority to impose charges under its Storm Water Management Utility Ordinance on parcels of land held in trust by the United States for the Tribe located on the Oneida Reservation and within Hobart (subject trust lands). The Tribe also seeks injunctive relief enjoining the Village from attempting to enforce its Ordinance upon tribal lands. (Compl., ECF No. 1.) There is no

question that the Tribe is the beneficial owner of the subject trust lands. The case is before me now on the Tribe's motion for summary judgment. The Tribe moves for summary judgment on two claims for relief: first, that the charges imposed on its trust property under the Village's Storm Water Management Utility Ordinance (the Ordinance) constitute an impermissible tax on the subject trust lands; and second, that federal common and statutory law preempt application of the Ordinance on the subject trust lands, whether or not it constitutes a tax.[1] (Tribe's Br. in Supp., ECF No. 48 at 1–2.)

The Village denies that the Tribe is entitled to such relief, but in the alternative, if the Tribe is not responsible for the utility charges, the Village claims that the United States must pay. Thus, in July 2010, the Village filed a third-party complaint against the United States, alleging that the United States, as holder of the bare title to the tribal trust lands, must pay the storm water fees if the Tribe is not responsible for doing so. (Third Pty. Compl., ECF No. 15.) This Court dismissed the third-party complaint, holding that the Village had failed to state a claim under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–706, because there had been no final agency action. (April 18, 2011 Order, ECF No. 34.) The Village then presented the Department of the Interior with a request for payment of $237,862.06 in storm water fees, which the Department denied by letter dated October 20, 2011. (ECF No. 40-1.) Having thus obtained the final agency action required for a suit under the APA, the Village has renewed its third-party claims against the United States.

---

[1] The Tribe also asserts a third claim for relief: that imposition of the Ordinance on the subject trust lands impermissibly infringes upon the Tribe's inherent powers of self-government, whether or not it constitutes a tax. But the Tribe concedes this third claim is dependent upon factual allegations regarding storm water activities and programs relating to the subject trust lands that may not be susceptible to disposition on summary judgment. (*See, e.g.*, Compl. ¶ 20.) Accordingly it will not be addressed here.

2

(Am. Third Pty. Compl., ECF No. 43.)  The Village seeks a declaratory judgment that the United States must pay "all past and future storm water related fees" and a monetary judgment "for all fees currently due and owing."  (*Id.* at 16.)  The Village also seeks declaratory and injunctive relief affirming the Village's jurisdiction to impose its Storm Water Management Utility charges on Indian trust land and preventing the United States from invoking a federal regulation, 25 C.F.R. § 1.4, which exempts trust land from state and local property laws.  *Id.*  In response, the United States filed a motion to dismiss the Amended Third Party Complaint for lack of subject matter jurisdiction or failure to state a claim upon which relief can be granted.  (Mot. to Dismiss, ECF No. 53.)

Both motions have been fully briefed and argued by the parties.  For the reasons discussed herein, the Court concludes that the Village's Storm Water Utility Management charges constitute an impermissible tax on Tribal trust property for which neither the Tribe nor the United States are liable.  Accordingly, the motions of the Tribe and the United States will be granted.

**BACKGROUND**

The Tribe is a federally recognized Indian tribe in possession of the Oneida Reservation, set aside by treaty in 1838.  (Treaty with the Oneida, 7 Stat. 566.)  The Tribe adopted a Constitution under the Indian Reorganization Act (IRA), which authorizes tribes to organize and authorizes the Secretary of the Interior to acquire and hold land in trust for tribes.  25 U.S.C. §§ 465 and 476.  On December 21, 1936, the Secretary of the Interior approved the Tribe's IRA Constitution.  (Webster Aff., ECF No. 49 ¶ 3.)  The Tribe is located on the Oneida Reservation in Wisconsin, which was established by the 1838 Treaty with the Oneida.  The Reservation once encompassed 64,000 acres

3

of tribal land; all or almost all of that land was allotted and fell out of Tribal ownership between 1889 and 1934. *Oneida Tribe of Indians of Wisc. v. Village of Hobart*, 542 F. Supp. 2d 908, 910–12 (E.D. Wis. 2008). Following passage of the IRA, and particularly since the dramatic increase in revenue the Tribe achieved after the enactment of the Indian Gaming Regulatory Act in 1988, the Tribe has been reacquiring land within the original reservation, some of which has been taken back into trust for the benefit of the Tribe by the Secretary of Interior.

Today, the United States holds in trust for the Tribe 148 parcels comprising approximately 1400 acres of land that are located within the boundaries of Hobart. (Stipulation of Facts, ECF No. 50, ¶¶ 4, 5.) The Tribe also owns land in fee within the Reservation, but that land is not the subject of this action. The subject trust lands include, among others, the following parcels, as identified in the county tax records: HB-1295, the site of the Oneida Police Department; HB-97, the site of the Oneida Community Health Center; HB-1317, the site of the Tribe's Oneida Elder Services Complex and the Tribe's Airport Road Child Care; HB-753, the site of the Oneida Cultural Heritage Department; HB-753-2, the site of the Tribe's Oneida Language House; HB-753-2 and HB-746, the site of a tribal, five-acre storm water retention pond known as Osnusha Lake; and HB-1313-1, the site of the Tribe's community building known as Parish Hall. (Webster Aff., ¶¶ 18–24.) Parcels held in trust also include an auto body shop, a park and a library. (Tribe's Resp. To Village Statement of Additional Facts, ECF No. 65, ¶¶ 26-37.) ) The parcels at issue are not contiguous, but rather are interspersed throughout Hobart in a kind of checkerboard pattern.

The Town of Hobart (now the Village) was created by the state legislature in 1903 and lies wholly within the exterior boundaries of the Reservation. *Oneida Tribe*, 542 F. Supp. 2d at 912. In 2002, the Village incorporated under Wisconsin law, granting it additional authority under State

law. *Id.* at 913. According to the United States Census Bureau, the estimated 2011 population for the Village was 6,254, approximately 17.5% of which were Native American. http://quickfacts.census.gov/qfd/states/55/5535150.html (last visited September 1, 2012). The Village is adjacent to the City of Green Bay and the Village of Ashwaubenon.

In 2007, Hobart adopted its Storm Water Management Utility Ordinance in accordance with the Clean Water Act (the CWA). Congress enacted the CWA "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). As an operator of a Municipal Separate Storm Sewer System (MS4), Hobart is required to "develop, implement, and enforce a storm water management program designed to reduce the discharge of pollutants from [the] MS4 to the maximum extent practicable (MEP), to protect water quality, and to satisfy the appropriate water quality requirements of the Clean Water Act." 40 C.F.R. § 122.34(a).

The Ordinance identifies its purpose as protecting the general public welfare: "The Village of Hobart finds that the management of storm water and other surface water discharges within and beyond its borders is a matter that affects the public health, safety, and welfare of the Village, its citizens, businesses, and others in the surrounding area." Village of Hobart Code of Ordinances § 4.501(1). To accomplish this purpose, the Ordinance creates a storm water management utility, which is placed under the supervision of Hobart's legislative body, the Board. *Id.* § 4.502(1) and (2). The Ordinance authorizes the Village through the Storm Water Management Utility to "acquire, construct, lease, own, and operate . . . such facilities as are deemed by the Village to be proper and reasonably necessary for a system of storm and surface water management," including "surface and underground drainage facilities, sewers, watercourses, retaining walls and ponds and such other facilities as will support a storm water management system." *Id.* § 4.503(1). The

5

Ordinance also authorizes the Village through the Storm Water Management Utility to "establish such rates and charges as are necessary to finance planning, design construction, maintenance, administration, and operation of the facilities in accordance with the procedures set forth in this ordinance." *Id.* § 4.503(2).

Two basic types of "charges" are authorized under the Ordinance. First, a "base charge" is imposed on all developed property "to reflect the fact that all developed properties benefit from storm water management activities of the Village and that all developed properties contribute in some way."[2] Second, an "equivalent runoff unit charge" (ERU) is imposed based upon the amount of impervious area as determined by Hobart's Administrator. *Id.* § 4.505(4)(a) and (b). In addition, a flat "equivalent runoff unit charge" is imposed even on undeveloped parcels at the rate of two-tenths of one unit per parcel up to 100 acres. *Id.* § 4.507(4)(g). The Ordinance authorizes offsets against the "equivalent runoff charge" but offsets against the "base charge" are specifically prohibited. *Id.* § 4.506(1). There are also percentage caps on the allowable credits which ensure that some amount of the "equivalent runoff unit charge" will always be assessed.

The Ordinance also authorizes an additional special charge that is linked to the delivery of storm water services, i.e., for those parcels "in a specific area benefited [sic] by a particular storm water management facility," and a one-time connection charge when a parcel converts from undeveloped to developed or otherwise connects to Hobart's system. *Id.* § 4.505(4)(c) and (d). Offsets against the special charges are authorized, again subject to a percentage cap. *Id.* § 4.506(1).

---

[2] The Ordinance defines developed property as real property that "has been altered from its natural state by the addition of any improvements that may include a building, structure, impervious surface, and change in grade or landscaping." *Id.* § 4.504(3).

6

The Ordinance also sets forth a collection procedure and a set of penalties for nonpayment. It provides that the property owner is responsible for the storm water charges on real property "that he/she or it owns." *Id.* § 4.508(2). Unpaid delinquent charges "shall be a lien upon the property served and shall be enforced as provided in [Wis. Stat.] § 66.0809(3)." *Id.* § 4.508(3). The statutory provision adopted by the Ordinance for enforcement is that set out in state law for the collection of municipal public utility charges. This process requires delinquency notice; it further provides that unpaid charges become a lien upon the property and "the clerk shall insert the delinquent amount and penalty as a tax against the lot or parcel of real estate." Wis. Stat. § 66.0809(3). Finally, the statute directs, "All proceedings in relation to the collection of general property taxes and to the return and sale of property for delinquent taxes apply to the tax if it is not paid within the time required by law for payment of taxes upon real estate." *Id.*

So far, the Village has not asserted a base charge as part of its storm water management fees. The current fees are based solely on the Equivalent Runoff Unit. Each year since its enactment, Hobart has billed the Tribe for "charges" allegedly due under the Ordinance as to the subject trust lands. (Stip. ¶¶ 8–11.) The Tribe has refused to pay the "charges" as it believes its trust land is immune from the Ordinance and that Hobart lacks authority to impose charges under the Ordinance on the subject trust lands.[3] (*Id.* ¶¶ 8,9.) Because of its refusal to pay the allegedly outstanding "charges," the Tribe has received tax foreclosure notices from Brown County as to 143 of the

_____

[3] The Tribe had also requested the assistance of the Regional Director, Bureau of Indian Affairs, Midwest Region, regarding Hobart's demand. The Regional Director responded in a letter to the Tribe and Hobart, dated March 24, 2009, that the "charge is clearly a tax that may not be imposed on land held in trust by the United States." (Compl., Ex. D. ECF No. 1.)

7

subject trust lands. (Webster Aff. ¶ 11.) These notices state that, unless payment is made, the Tribe will incur "foreclosure costs and the publication of delinquent taxes in the newspaper." *Id.*

It is on the basis of these facts that the Tribe contends it is entitled to judgment as a matter of law. The Village opposes the Tribe's motion, but contends that if the Tribe is not responsible for the charges imposed under its Ordinance, then the Government is pursuant to Section 313 of the CWA. Because the Village's claim against the Government arises only if the Tribe is not liable, I will address the Tribe's motion first.

## LEGAL STANDARD

A motion for summary judgment should be granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Material" means that the factual dispute must be outcome-determinative under law. *Contreras v. City of Chicago*, 119 F.3d 1286, 1291 (7th Cir. 1997). A "genuine" issue must have specific and sufficient evidence that, were a jury to believe it, would support a verdict in the non-moving party's favor. Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The moving party has the burden of showing there are no facts to support the non-moving party's claim. *Celotex*, 477 U.S. at 322 (1986). In determining whether to order a motion for summary judgment, the court should consider the evidence presented in the light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255. When the record, taken as a whole, could not lead a rational jury to find for the nonmoving party, there is no genuine issue and therefore no reason to go to trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

8

# ANALYSIS

## A.  The Village's Storm Water Management Charges Constitute A Tax Upon Tribal Trust Property.

The Supreme Court long ago determined that tribal lands, held by Indians with whom the United States maintains a formal trust relationship, cannot be taxed by states wherein they are located.  *The Kansas Indians*, 72 U.S. 737 (1866).  Although this immunity from taxation was lost as to Indian lands that were conveyed by patent to tribal members during the allotment period, it was restored to those lands later acquired and taken in trust by the Government under the Indian Reorganization Act (IRA) of 1934.  *County of Yakima v. Confederated Tribes and Bands of Yakima Indian*, 502 U.S. 251, 264 (1992).  The IRA expressly provided that lands taken into trust for an Indian tribe would be "exempt from State and local taxation."  25 U.S.C. § 465.  It therefore remains the law that "a State is without power to tax reservation lands and reservation Indians" absent some federal statute permitting it.  *Okla. Tax Comm'n v. Chickasaw Nation*, 515 U.S. 450, 458 (1995) (quoting *Cnty. of Yakima*, 502 U.S. at 258).  Courts have declined to find a grant of such authority in federal statutes without clear Congressional intent.  *See Bryan v. Itasca Cnty.*, 426 U.S. 373, 380–87 (1976) (construing P.L. 280, 28 U.S.C. § 1360); *Moe v. Confederated Salish & Kootenai Tribes*, 425 U.S. 463, 376 (1976) (construing the General Allotment Act (GAA), 25 U.S.C. § 349).  Based on this settled law, the Tribe argues that the Village has no right to impose charges on its trust property under its Storm Water Management Utility Ordinance.

The Village does not dispute the Tribe's claim that it's trust property is exempt from Village taxation.  Instead, the Village denies it has imposed a tax on the Tribe's trust property.  The Village contends that the charges its has imposed on the subject trust lands under its Ordinance constitute

9

not taxes, but fees for the services performed, or to be performed, by its Storm Water Management Utility that will benefit all of the landowners of the Village, including the Tribe. Since the charges do not constitute taxes, the Village contends they are lawful and the Tribe's attempt to avoid them should be rejected.

In support of its argument that the Storm Water Utility Management charges are not taxes, the Village cites a string of decisions which apply state law to determine the validity of a given "tax" under either a state constitutional provision or state statute.[4] But as the Tribe points out, the determination of whether a given charge upon Indian property constitutes an impermissible tax is determined by *federal*, not state, law. *See Carpenter v. Shaw*, 280 U.S. 363, 368–69 (1930) ("Where a federal right is concerned we are not bound by the characterization given to a state tax by the state courts or legislatures, or relieved by it from the duty of considering the real nature of the tax and its effect upon the federal right asserted."). Moreover, whereas tax exemptions are generally construed narrowly, tax exemptions granted to Indians by the federal government are liberally construed. *Id.* at 366-37.

A tax is "a monetary charge imposed by the government on persons, entities, or property to yield public revenue." BLACK'S LAW DICTIONARY 1469 (7th ed. 1999). A fee, on the other hand, is generally a "charge for labor or services." *Id.* at 629. Of course, governments can also impose

---

[4] *See El Paso Apt. Ass'n v. City of El Paso*, 2008 WL 2641350 (W.D. Tx. June 24, 2008) (state constitution); *Church of Peace v. City of Rock Island*, 828 N.E. 2d 1282 (Ill. App. 2005) (state statute); *Smith v. Spokane Co.*, 948 P.2d 101 (Wash. Ct. App. 1997) (state constitution); *Sarasota Co. v. Sarasota Church of Christ*, 667 S.2d 180 (Fla. 1995) (state statute); *City of River Falls v. St. Bridget's Catholic Church of River Falls*, 182 Wis. 2d 436 (Ct. App. 1994) (state constitution); *City of Littleton v. State*, 855 P.2d 448 (Colo. 1993) (state constitution); *Long Run Baptist Ass'n v. Sewer Dist.*, 775 S.W.2d 520 (Ky. Ct. App. 1989) (state constitution); *Zelinger v. City and Cnty. of Denver*, 724 P.2d 1356 (Colo. 1986) (state constitution); *Teter v. Clark Cnty.*, 104 Wash. 2d 227 (1985) (state constitution); *State v. Jackman*, 60 Wis. 2d 700 (1973) (state constitution).

10

fees. And "[t]he line between a tax and a fee, and a tax and a fine, is sometimes fuzzy . . . ." *Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 651 F.3d 722, 729 (7th Cir. 2011) (*en banc*). Yet, courts are frequently required to distinguish between them. The issue most frequently arises in federal courts in the context of deciding whether the requested relief is barred by the Tax Injunction Act, 28 U.S.C. § 1341.

Perhaps the clearest discussion of the issue appears in *San Juan Cellular Telephone Co. v. Public Service Commission of Puerto Rico*, 967 F.2d 683 (1st Cir.1992). There, then Chief Judge, now Justice, Breyer set out a framework for distinguishing between a tax and a fee:

> Courts have had to distinguish "taxes" from regulatory "fees" in a variety of statutory contexts. Yet, in doing so, they have analyzed the legal issues in similar ways. They have sketched a spectrum with a paradigmatic tax at one end and a paradigmatic fee at the other. The classic "tax" is imposed by a legislature upon many, or all, citizens. It raises money, contributed to a general fund, and spent for the benefit of the entire community. *See, e.g., National Cable Television Ass'n. v. United States*, 415 U.S. 336, 340-41(1974); *Robinson Protective Alarm Co. v. City of Philadelphia*, 581 F.2d 371, 376 (3d Cir.1978); *Butler* [*v. Maine Supreme Judicial Court*, 767 F. Supp. [17] at 19 (D. Me. 1991). The classic "regulatory fee" is imposed by an agency upon those subject to its regulation. *See New England Power Co. v. U.S. Nuclear Regulatory Commission*, 683 F.2d 12, 14 (1st Cir.1982). It may serve regulatory purposes directly by, for example, deliberately discouraging particular conduct by making it more expensive. *See, e.g., South Carolina ex rel. Tindal v. Block*, 717 F.2d 874, 887 (4th Cir.1983); *cert. denied*, 465 U.S. 1080 (1984). Or, it may serve such purposes indirectly by, for example, raising money placed in a special fund to help defray the agency's regulation-related expenses. *See, e.g., Union Pacific Railroad Co. v. Public Utility Commission*, 899 F.2d 854, 856 (9th Cir.1990); *In re Justices*, 695 F.2d at 27; *see also National Cable*, 415 U.S. at 343-44.

967 F.2d at 685. Distilled further, *San Juan Cellular* suggests that in determining whether a government exaction is a tax or a fee, a court should focus on three questions: "(1) What entity imposed the fee? (2) What parties are being assessed the fee? (3) Is the revenue generated by the fee expended for general public purposes or used for the regulation and benefit of the parties upon

11

whom the assessment is imposed?" *McLeod v. Columbia County, GA*, 254 F. Supp.2d 1340, 1345 (S.D. Ga. 2003). If the exaction is imposed by the legislature upon all, or almost all, of the citizens or property to accomplish a general public purpose, it is more likely to be a tax. If, on the other hand, the charge is imposed by a government agency on a specific subset of citizens or conduct subject to regulation by the agency and is set at such amount as to discourage certain conduct or defray the costs of the agency, it is a fee.[5]

In *McLeod*, the plaintiff landowners sued their county in state court seeking to enjoin the assessment and collection charges imposed under a storm water management ordinance virtually identical to the one at issue here. Upon removal of the case to federal court, the Court raised the question of whether the Tax Injunction Act precluded federal jurisdiction. Using the framework described above, the Court concluded that the charges imposed on the property constituted taxes and remanded the case back to state court for lack of federal jurisdiction. I find the Court's analysis persuasive here.

Like the ordinance in *McLeod*, a fair reading of the Ordinance in this case reveals that it is the legislative body, here, the Village Board, that imposed the fee. Although the Village established a Storm Water Management Utility, the Ordinance expressly states that "the Village Board is

---

[5] The Village offers a different test in its attempt to determine whether charges imposed by local governments upon federal facilities constitutes a service charge or a tax. It cites *Massachusetts v. United States*, 435 U.S. 444 (1978). The Tribe notes that the question in Massachusetts was whether a federal charge imposed on state interests constituted a tax — not whether a local charge could be imposed on a federal interest. *Id.* at 446. Federal immunity from state taxation is predicated on the Supremacy Clause whereas state immunity from Federal taxation is *implied* from the states' relationship to the national government within the constitutional scheme. *Id.* at 455. The difference is significant and makes the two analytically distinct. *Massachusetts* is accordingly inapplicable here.

exercising its authority . . . . to set the rates for storm water management services." Ordinance at § 4.502(1). It is the Village, acting through the Storm Water Management Utility that is authorized to "establish such rates and charges as are necessary to finance planning, design construction, maintenance, administration, and operation of the facilities in accordance with the procedures set forth in this ordinance." *Id.* at § 4.503(2). Finally, the Ordinance states that "The amount of the charge to be imposed, for each customer classification shall be made by resolution of the Village Board." *Id.* at § 4.505(3). Thus, just as the Village Board is authorized to levy taxes on property within the Village, *see* Wis. Stat. § 61.34(4), it also is the body that determines the Storm Water Management charges. In fact, the assessments made under the Ordinance are collected in the same way and using the same procedure as unpaid property taxes. Ordinance at § 4.508.

The question of who is assessed the fees also supports the conclusion that the fee is a tax. The Ordinance authorizes an assessment on all property within the district, whether developed or not. *Id.* § 4.507(4). It expressly directs the Village Board to "establish a uniform system of storm water service charges that shall apply to each and every lot or parcel within the Village." *Id.* at § 4.505(1). The fact that the Village has not fully implemented its program and has so far assessed only the ERU rates and not the base charges authorized by the Ordinance does not alter the analysis. The Village has not suggested that the fact it has failed to so far fully implement the Ordinance reflects any intent to retreat from its claimed authority to impose such charges on all of the Tribe's trust property. Nor has the Village argued that its phased implementation of the Ordinance should somehow change the result.

Finally, the revenue generated by the fees is for a public benefit, as opposed to the individual owners of the property upon which the charges are assessed. *See McCleod*, 254 F. Supp.2d at 1348

13

("Storm water management was and is the type of service that is often funded through general tax revenue."). Storm water run-off can carry pollutants into waterways and thereby cause damage to the environment. But the resulting damage is to the public generally, not the individual property owner. Everyone who lives in the Village, and even many outside the Village boundaries, have an interest in preventing environmental damage due to storm water run-off.

The Village argues that the assessments should nevertheless be considered fees rather than taxes because the rates imposed are set at a rate reasonably estimated to cover the costs of the program, and the Village created and maintains a separate budget for storm water management purposes. All revenue generated from the fees are used solely to fund the Storm Water Management Utility in the performance of its duties, and none of the money is commingled with the Village's general fund. But the segregation of funds for a particular purpose is not enough to change the character of the assessment. In *Schneider Transport, Inc. v. Cattanach*, for example, the Seventh Circuit held that registration fees for trucks charged by the Wisconsin Department of Transportation was a "tax" even though the fees were deposited in a segregated fund used for highway construction. 657 F.2d 128, 132 (7th Cir. 1981), cert. denied, 455 U.S. 909 (1982). Storm water management and control, like highway construction, is a public service typically funded by government through tax revenue.

In reality, the Village's funding mechanism for its storm water management utility operates comparably to a school tax. Each property owner within a community is assessed a school property tax regardless of whether the property owners themselves have children attending public schools. The goal of school property tax is, of course, to benefit the community as a whole rather than individuals receiving a denominated service. Like a school tax, Hobart's ordinance assesses each

14

property within the community a charge, the revenues of which will be collected to support the operation of the storm water management utility that benefits the community as a whole. In short, Hobart's "charge" is a tax for all meaningful purposes here. And like property taxes used to pay for schools, the storm water management fees confer a benefit on the public generally, as opposed to only those who pay.

Notwithstanding these considerations, the Village argues that in Section 313 of the CWA Congress expressly defined storm water charges as permissible fees owed for otherwise tax exempt properties, including Indian Tribes. Section 313 reads, in pertinent part, as follows:

**(a) Compliance with pollution control requirements by Federal entities.**
Each department, agency, or instrumentality of the executive, legislative, and judicial branches of the Federal Government **(1)** having jurisdiction over any property or facility, or **(2)** engaged in any activity resulting, or which may result, in the discharge or runoff of pollutants, and each officer, agent, or employee thereof in the performance of his official duties, shall be subject to, and comply with, all Federal, State, interstate, and local requirements, administrative authority, and process and sanctions respecting the control and abatement of water pollution in the same manner, and to the same extent as any nongovernmental entity including the payment of reasonable service charges….

33 U.S.C. § 1323(a). The CWA goes on to define what is meant by a reasonable service charge that may be asserted even though taxation is prohibited:

**(c) Reasonable service charges.**
**(1) In general**
For the purposes of this chapter, reasonable service charges described in subsection (a) include any reasonable nondiscriminatory fee, charge, or assessment that is—
**(A)** based on some fair approximation of the proportionate contribution of the property or facility to stormwater pollution (in terms of quantities of pollutants, or volume or rate of stormwater discharge or runoff from the property or facility); and
**(B)** used to pay or reimburse the costs associated with any stormwater management program (whether associated with a separate storm sewer system or a sewer system that manages a combination of stormwater and sanitary waste), including the full range of programmatic and structural costs attributable to collecting stormwater, reducing pollutants in stormwater, and reducing the volume and rate of stormwater discharge, regardless of whether that reasonable fee, charge, or assessment is

15

denominated a tax.

*Id.* Based on these provisions, the Village argues that Congress has expressly defined storm water charges as permissible fees, rather than taxes, and authorized the collection of such fees from Indian Tribes otherwise immune from state and local taxation. (Hob. Br. in Op., ECF No. 57, at 6.)

Section 313 of the CWA, however, is not the kind of clear statement of intent that is required to allow local taxation of Indian trust land. *See Cass County, Minn. v. Leech Lake Band of Chippewa Indians*, 524 U.S. 103, 110 (1998) ("We have consistently declined to find that Congress has authorized such taxation unless it has 'made its intention to do so unmistakably clear.' (quoting *Yakima*, 502 U.S. at 258)). That section, by its terms, establishes the Government's duty to comply with the substantive and procedural requirements of the CWA at federal facilities and explicitly waives its immunity for civil penalties. *U.S. Dept. of Energy v. Ohio*, 503 U.S. 607, 627-28 (1992). But it says nothing about Indian tribes or property owned by Indian tribes. It therefore falls far short of the unmistakable clarity required for a waiver of immunity from taxation.

That the CWA does not provide the Village the power to tax the Tribe is also clear from the general framework of the CWA. The CWA prohibits the discharge of pollutants into navigable waters unless the discharge is authorized under a National Pollutant Discharge Elimination System (NPDES) permit. 33 U.S.C. § 1342. Permits can be issued by the EPA or by state agencies subject to EPA review. 33 U.S.C. § 1342. States can establish their own water quality standards for waters within their boundaries. 33 U.S.C. § 1313. In 1987, Congress amended the CWA to authorize Indian tribes to apply to the EPA for authorization to establish and administer a system for issuing permits within their reservations. 33 U.S.C. § 1377(e). In the absence of tribal regulation of reservations, though, the EPA itself remains the proper authority to administer CWA programs on tribal trust lands "because state laws may usually be applied to Indians on their reservations *only if*

16

*Congress so expressly provides*." *Wisconsin v. EPA*, 266 F.3d 741, 747 (7th Cir. 2001) (emphasis added);*see also State of Washington, Dep't of Ecology v. EPA*, 752 F.2d 1465 (9th Cir. 1985) (construing a related environmental statute and concluding it precluded state and local authority over tribal lands).  Nothing in the language of Section 313 of the CWA suggests that Congress intended to provide State or local governments authority to administer the CWA on Indian trust lands.  The statute merely requires that *federal agencies* with jurisdiction over property or facilities comply with local regulations regarding storm water management.

The Village also suggests that Congress' 2011 amendment to the CWA adding subsection (c), which defined the "reasonable service charges" for which federal agencies are liable under subsection (a), constitutes a Congressional determination that such charges are not taxes and can thus be properly assessed against tribal trust property.  Again, the Village reads too much into the language of the statute.  It simply states that the federal agency in charge of the facility is to be responsible for the charges regardless of what they are called.  For the reasons set forth, the Court concludes that the Village's storm water management charges against the Tribe's trust property constitute an impermissible tax.  Accordingly, the Village will be enjoined from assessing or collecting such taxes.

**B. The Village May Not Collect Its Storm Water Management Charges Against the Government.**

Having concluded that the storm water management charges on the subject trust lands constitute an impermissible tax, I now turn to the question of whether the Village's third-party complaint against the United States should be dismissed.  The Government argues that dismissal

17

is appropriate because this Court lacks subject matter jurisdiction and the complaint fails to state a claim upon which relief may be granted. Before reaching the merits on the Government's 12(b)(6) motion to dismiss, the Court must first determine whether there is any arguable basis for subject matter jurisdiction.

Under Federal Rule of Civil Procedure 12(b)(1), a court may dismiss an action for lack of subject matter jurisdiction. "[T]he district court must accept the complaint's well-pleaded factual allegations as true and draw reasonable inferences from those allegations in the plaintiff's favor." *Transit Express, Inc. v. Ettinger*, 246 F.3d 1018, 1023 (7th Cir. 2001) (citing *Rueth v. EPA*, 13 F.3d 227, 229 (7th Cir. 1993)). However, the plaintiff bears the burden of establishing jurisdictional requirements. *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443 (7th Cir. 2009). Moreover, when considering a motion to dismiss for lack of jurisdiction, "the district court may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Johnson v. Apna Ghar, Inc.*, 330 F.3d 999, 1001 (7th Cir. 2003) (quoting *Long v. Shorebank Dev. Corp.*, 182 F.3d 548, 554 (7th Cir. 1999)).

In a suit against the United States, "the jurisdictional allegations in the plaintiff's complaint must refer to a statute that waives the sovereign's immunity." *Metro. Sanitary Dist. Of Greater Chicago v. United States*, 737 F. Supp. 51, 52 (N.D. Ill. 1990). The Village's complaint refers to § 313 of the CWA, 33 U.S.C. § 1323(a), and asserts the statute is a waiver of the Government's immunity. Under 28 U.S.C. § 1331, federal courts "have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." According to Supreme Court precedent, "[t]his provision for federal-question jurisdiction is invoked by and large by plaintiffs

18

pleading a cause of action created by federal law." *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 312 (2005). A federal cause of action "may be created either expressly or by implication." *Id.* at 282. Courts have held that Congressional intent to create a federal cause of action can be found in a federal statute "permit[ting] a claimant to bring a claim in federal court." *Int'l Union of Operating Eng'rs, Local 150, AFL-CIO, v. Ward*, 563 F.3d 276, 283 (7th Cir. 2009). As an initial matter, the Village's claim does arise under the laws of the United States sufficient to confer jurisdiction under § 1331 provided that the Village's interpretation of the statute is correct.

The Village, in its amended third-party complaint seeks declaratory judgment that "it may impose upon the property held in trust for the benefit of the Oneida Tribe of Indians of Wisconsin ("Tribe"), its storm water ordinances and assert fees and charges associated therewith, all pursuant to the Village's storm water ordinances and the Clean Water Act." (Am. Third Pty. Compl., ECF No. 43, ¶ 1.) For the reasons outlined above, the Village's claim that it can assess its charges against the Tribe's trust property fails. Since the Tribe's trust property is immune, there is no liability to impose upon the United States. To require the United States to pay the Village's storm water management fees would circumvent the immunity from taxation that Indian trust lands enjoy. For this reason alone, the Village's claims against the United States should be dismissed.

The Village contends, however, that the United States is liable in its own right because it owns the property in trust for the Tribe and has expressly waived its own immunity. The Village again relies on CWA Section 313(a), claiming that this subsection contains, if not a waiver of

19

immunity as to the Tribe, at least a waiver of United States' immunity.  (Hobart Br. in Opp'n, ECF No. 58 at 3–6.)  To repeat, Section 313(a) provides in pertinent part :

> Each department, agency, or instrumentality of the executive, legislative, and judicial branches of the Federal Government (1) having *jurisdiction over any property* or facility, . . . shall be subject to, and comply with, all Federal, State, interstate, and local requirements, administrative authority, and process and sanctions respecting the control and abatement of water pollution in the same manner, and to the same extent as any nongovernmental entity including the payment of reasonable service charges.

33 U.S.C. § 1323(a) (emphasis added).  According to the Village, the language "jurisdiction over any property" is a waiver of the Government's immunity as it relates to its position as title holder over the subject trust lands.  (ECF No. 58 at 3–4.)

As the Government points out, Congress can, of course, waive federal sovereign immunity to suit, *Block v. North Dakota*, 461 U.S. 273, 280 (1983), but it must do so unequivocally.  Under the Supreme Court's strict construction rule, any waiver of sovereign immunity must not only be express, but also must be "construed strictly in favor of the sovereign" and "not 'enlarged . . . beyond what the language requires.'"  *Dep't of Energy v. Ohio*, 503 U.S. at 615 (citations omitted).  The waiver may not be implied, assumed, or based upon inference or ambiguity. *Lane v. Pena*, 518 U.S. 187, 192 (1996); *Bethlehem Steel Corp. v. Bush*, 918 F.2d 1323, 1329 (7th Cir. 1990).  The existence of "plausible" alternative interpretations of statutory language "is enough to establish that a reading imposing monetary liability on the Government is not 'unambiguous,'" *United States v. Nordic Vill., Inc.*, 503 U.S. 30, 37 (1992), and therefore cannot stand.

The language of Section 313 does not reasonably support a construction that would, in essence, substitute the immunity of Indian tribes from taxation of their trust property for liability on the part of the federal government.  Certainly, it falls far short of unequivocally indicating such an

20

intent by Congress. By its terms, Section 313 requires federal facilities to comply with the specified state and local water pollution control requirements and therefore is a waiver of sovereign immunity from suit in specific instances. Simply stated, holding bare legal title over Indian lands is not sufficient to bring such property within the jurisdiction of the United States within the meaning of Section 313(a). The Village's claim against the United States therefore fails. The United States is immune from the Village's suit and subject matter jurisdiction is therefore lacking. Accordingly the Village's third party claims will be dismissed.

## CONCLUSION

As suggested above, this is not the first case over which this Court has presided between the Tribe and the Village, and it is unlikely to be the last. The central problem is that a significant portion of land interspersed throughout the Village is owned by a sovereign Indian tribe and is therefore not subject to the Village's taxing and regulatory or zoning powers. Although counsel for the Government stated at oral argument that checkerboard patterns of Indian trust land within municipal boundaries are not unique to the Village of Hobart, it is clear that such situations present serious problems for local governments. Providing and funding public services becomes more difficult as various parcels are removed from the municipal tax rolls and are no longer subject to municipal zoning or land use regulations. *See* Amanda Hettler, *Beyond A Carcieri Fix: The Need For Broader Reform Of The Land-Into-Trust Process Of The Indian Reorganization Act Of 1934*, 96 Iowa L. Rev. 1377, 1396-98 (2011). These difficulties are exacerbated when the land placed in trust is interspersed throughout the municipal boundaries. In order to overcome them, there must be cooperation between the Village and the Tribe. The plain fact, however, is that the interests of

21

the Village and the Tribe are not aligned; their constituencies are not the same and they have vastly different plans for the future. As a result, cooperation is more difficult. But this does not change the law.

For the reasons set forth above, the "charges" in the Ordinance cannot stand against the Tribe. The "charges" under the Ordinance constitute an impermissible tax on the Tribe's trust property. The Tribe is therefore immune from Hobart's Storm Water Management Utility Ordinance. Accordingly, the Tribe's motion for summary judgment (ECF No. 47) is **GRANTED**. The clerk is directed to enter judgment in favor of the Tribe declaring that the Tribe's trust land is immune from the Village's Storm Water Management Utility Ordinance and that the Village lacks authority to impose charges under the Ordinance on the Tribe's land directly or indirectly. The judgment shall also enjoin the Village from attempting to impose and collect "charges" under the Ordinance from the Tribe or from foreclosing on the Tribe's lands.

Furthermore, the Village's claims against the United States are dismissed for lack of subject matter jurisdiction because Section 313 of the CWA does not constitute a waiver of the United States' sovereign immunity over Indian trust lands. Accordingly, the United States' motion to dismiss (ECF No. 53) is **GRANTED**.

**SO ORDERED** this __5th__ day of September, 2012.

s/ William C. Griesbach
William C. Griesbach
United States District Judge

22